66 Cal.Rptr.3d 458 (2007)
155 Cal.App.4th 1082
Lorraine STEINHART, Plaintiff and Appellant,
v.
COUNTY OF LOS ANGELES, Defendant and Respondent.
No. B190957.
Court of Appeal of California, Second District, Division Three.
September 28, 2007.
*460 Terran T. Steinhart, Los Angeles, for Plaintiff and Appellant.
Stephen H. Bennett in pro. per.; Trevor A. Grimm, Los Angeles, Jonathan M. Coupal and Timothy A. Bittle, Sacramento, for Howard Jarvis Taxpayers Association as Amicus Curiae on behalf of Plaintiff and Appellant.
Raymond G. Fortner, Jr., County Counsel (Los Angeles), Richard Girgado, Deputy County Counsel, for Defendant and Respondent.
Edmund G. Brown, Jr. Attorney General, David S. Chaney, Chief Assistant Attorney General, Paul D. Gifford, Assistant Attorney General, Gordon Burns, Deputy State Solicitor General, and William L. Carter, Deputy Attorney General, for California State Board of Equalization as Amicus Curiae on behalf of Defendant and Respondent.
Richard E. Winnie, County Counsel (Alameda), Claude R. Kolm, Deputy County Counsel; Robert A. Ryan, Jr., County Counsel (Sacramento), Thomas R. Parker, Deputy County Counsel, for California State Association of Counties and the California Assessor's Association as Amicus Curiae.
Michael V. Strong, in pro. per., as Amicus Curiae.
*459 KLEIN, P.J.
Plaintiff and appellant Lorraine Steinhart (Steinhart) appeals a judgment of dismissal following the sustaining without leave of a demurrer interposed by defendant and respondent County of Los Angeles (the County) to Steinhart's original complaint.
In this action for refund of real estate taxes paid, the essential issue presented is whether Steinhart's acquisition of a life estate in real property upon the death of her sister constituted a change of ownership so as to trigger a reassessment.
We conclude the conveyance of a life estate to Steinhart was not a transfer "substantially equal to the value of the fee interest." (Rev. & Tax.Code, § 60.)[1] Therefore, there was no change in ownership for purposes of Proposition 13.
Accordingly, the judgment of dismissal is reversed with directions to reinstate the complaint.

FACTUAL AND PROCEDURAL BACKGROUND

1. The County reassessed the subject real property upon Steinhart's acquisition of a life estate therein; Steinhart paid the increased taxes and thereafter unsuccessfully sought a refund.

During her lifetime, Steinhart's sister, Esther Helfrick, created a living trust into which she transferred the subject real property in Sherman Oaks, California. Under the terms of the trust, if Steinhart were to survive Helfrick, Steinhart would *461 have the right to "occupy and use ... the residential property, for so long as she lives." Helfrick died on March 24, 2001. At that time, Steinhart, who was then 73 years old, became the life tenant of the property.
Prior to Helfrick's death, the property's assessed value was $96,638 with total taxes of $1,105.79. After Helfrick's death, the County reassessed the property and raised the valuation by $402,362, to a new assessed value of $499,000. The County issued a prorated supplemental tax bill for the 2000-2001 tax year in the amount of $1,085.19. In subsequent years, the County sent property tax bills as follows: $5,492.67 (2001-2002); $5,764.45 (2002-2003); and $6,245.33 (2003-2004), which bills were paid by Steinhart.
On July 24, 2004, Steinhart filed a claim of refund of property taxes with the County Auditor-Controller, seeking a refund of $18,587.64. Steinhart asserted a "change in ownership" for purposes of Proposition 13, as defined in section 60, did not occur upon Helfrick's death. Therefore, the property should not have been reassessed in the 2000-2001 tax year and the assessment in the subsequent years could not be increased by more than 2 percent per year, pursuant to Proposition 13.
On March 2, 2005, the Auditor-Controller sent Steinhart five letters relating to the various tax years and tax bills in issue. Each letter stated: "Your claim(s) was reviewed by the ASSESSOR. Based on your documentation you submitted, they determined that your claim does not meet the provisions in the Revenue and Taxation Code for granting a refund. For this reason, your claim(s) for refund is denied effective March 2, 2005.[¶] Section 5141 of the State of California Revenue and Taxation Code allows you six months from the effective date of denial of your claim(s) to commence an action in the Superior Court to seek judicial review of this denial." (Italics added.)
In addition, on March 3, 2005, the County notified Steinhart of its determination that "[t]he real property transfer is a `Change in Ownership', as defined by law, and the 100% reappraisal of the property will stand." This notice included the following provision: "NOTICE: [¶] This notice is your record of our action on your request for investigation. It is your responsibility to pay all billed tax installments. Disputes involving the assessed value of your property should be formally addressed to the Assessment Appeals Board at (213) 974-1471." (Italics added.)
Steinhart did not pursue the matter with the Assessment Appeals Board.

2. Steinhart's complaint for recovery of real estate taxes paid and declaratory relief.

On August 29, 2005, within six months of the March 2, 2005 denial of Steinhart's refund claim, Steinhart filed suit against the County for recovery of real estate taxes paid and declaratory relief. The action was filed as a limited civil caseover $10,000.
Steinhart alleged the County erred in denying her claim for refund because her acquisition of a life estate did not constitute a change in ownership within the meaning of Proposition 13. By way of relief, Steinhart sought recovery of excess real property taxes she paid on the subject property for the fiscal years in issue, as well as "a declaration that pursuant to the terms of the trust instrument, no change of ownership occurred as of the date of decedent's death, and hence, defendants were not legally authorized to tax the residence based on a reevaluation of the property as of the date of decedent's death."
*462 Steinhart appended to her complaint various exhibits including copies of: the trust instrument; property tax bills for the fiscal years 2000-2001, 2001-2002, 2002-2003 and 2003-2004; cancelled checks showing her payment of said bills; her claim for refund and the County's denial thereof.

3. Proceedings.

The County filed a demurrer, asserting the pleading failed to state a cause of action because: Steinhart failed to exhaust her administrative remedies before filing suit; and transfer of a life estate to a nonspouse third party constitutes a change of ownership under section 60, so as to preclude Steinhart from claiming no change in ownership occurred.
At the hearing on the demurrer, the trial court on its own motion ruled that as a limited civil court it lacked jurisdiction over an action for declaratory relief and reclassified the action as an unlimited civil case.
After the case was reclassified and transferred, the County again filed a demurrer on three grounds: the action was barred by Steinhart's failure to exhaust her administrative remedies; transfer of a life estate to a nonspouse third party constitutes a change of ownership under section 60; and a court does not have authority to issue declaratory relief invalidating a property tax assessment because such an order would in effect prevent or enjoin the collection of a tax (§ 4807).
In opposition, Steinhart contended a taxpayer is not required to exhaust administrative remedies where there are no issues of fact to be determined, and in any event, the County was estopped to assert the exhaustion requirement because its notice of rejection advised Steinhart she had six months to file suit to seek judicial review of the denial. Further, there was no change in ownership within the meaning of section 60 because in view of Steinhart's remaining life expectancy of 13.4 years, the value of the life estate was substantially less than the value of the fee interest.[2] Lastly, her action was not barred by section 4807 because it did not seek to enjoin the collection of tax but merely a refund of taxes paid, and only a judicial declaration in aid of obtaining a refund.
On March 7, 2006, the matter came on for hearing. The trial court sustained the County's demurrer to the original complaint without leave to amend and dismissed the action.
Steinhart filed a timely notice of appeal from the judgment of dismissal.

CONTENTIONS
Steinhart contends: (1) she was not required to exhaust administrative remedies because the complained of reassessment was a nullity as a matter of law and no factual questions existed regarding the valuation of the property, and in any event, the County is estopped to assert the exhaustion requirement; (2) pursuant to section 60, the transfer of a life estate pursuant to the terms of a living trust does not constitute a change of ownership upon which a reassessment can be based; and (3) her lawsuit, seeking a refund of previously paid real property taxes as well as declaratory relief, is not barred by section 4807 because it does not seek to enjoin or prevent the collection of property taxes.

*463 DISCUSSION

1. Standard of appellate review.

In determining whether a plaintiff has properly stated a claim for relief, "our standard of review is clear: `"We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff.' [Citations.]" (Zelig v. County of Los Angeles (2002) 27 Cal.4th 1112, 1126, 119 Cal.Rptr.2d 709, 45 P.3d 1171.) Our review is de novo. (Ibid.)

2. Procedural issues.

a. Exhaustion of administrative remedies.

The County contends Steinhart's action is barred by her failure to exhaust administrative remedies before the Assessment Appeals Board. The argument is unpersuasive because there was no factual question regarding the valuation of the property which the board might have resolved in Steinhart's favor so as to make further litigation unnecessary. (Stenocord Corp. v. City etc. of San Francisco (1970) 2 Cal.3d 984, 987, 88 Cal.Rptr. 166, 471 P.2d 966.) Rather, the determination that an assessable change in ownership occurred under section 60 is a pure question of law which we review de novo. (Reilly v. City and County of San Francisco (2006) 142 Cal.App.4th 480, 487, 48 Cal.Rptr.3d 291.)
Further, futility is an exception to the exhaustion of administrative remedies doctrine. (McKee v. Bell-Carter Olive Co. (1986) 186 Cal.App.3d 1230, 1245, 231 Cal.Rptr. 304.) Exhaustion of administrative remedies is not required if it can be positively stated what the administrative agency's ruling will be in a particular case. (Gantner & Mattern Co. v. California E. Com. (1941) 17 Cal.2d 314, 318, 109 P.2d 932; George Arakelian Farms, Inc. v. Agricultural Labor Relations Bd. (1985) 40 Cal.3d 654, 662, 221 Cal.Rptr. 488, 710 P.2d 288.) Here, at the trial court level and on appeal, the County continues to assert that as a matter of law, the transfer to Steinhart of a life estate from her late sister constitutes a change in ownership. In view of the County's unyielding position on this legal issue, an administrative challenge by Steinhart certainly would have been futile. Therefore, the County's exhaustion argument is meritless.

b. Steinhart's suit is not barred by section 4807's prohibition of actions to prevent or enjoin the collection of taxes.

We reject the County's argument that Steinhart's complaint is barred by section 4807. That section provides "[n]o injunction or writ of mandate or other legal or equitable process shall issue in any suit, action, or proceeding in any court against any county, municipality, or district, or any officer thereof, to prevent or enjoin the collection of property taxes sought to be collected."
Here, Steinhart is not suing to enjoin the collection of taxes; she already has paid the real property taxes for the years *464 in issue and is suing for a refund of taxes paid. Steinhart sought a judicial declaration only in aid of obtaining a refund, i.e., a ruling from the court to the effect that no change in ownership occurred and therefore the County was not authorized to reassess the subject real property.
We now turn to the merits of the appeal.

3. Overview of Proposition 13 and statutory scheme.

Proposition 13, adopted by the voters at the June 1978 primary election, added article XIII A to the California Constitution. (Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization (1978) 22 Cal.3d 208, 218, 149 Cal.Rptr. 239, 583 P.2d 1281 (Amador Valley).) It changed the system of assessing real property from one based on current value to one based on value at the time of acquisition. (Id. at p. 235-236, 149 Cal.Rptr. 239, 583 P.2d 1281.)
"The essence of Proposition 13 is its provision that all real property in the state shall be taxed at an ad valorem rate not to exceed 1 percent of its full cash value. (Cal. Const., art. XIII A, § 1, subd. (a).) `The full cash value means the county assessor's valuation of real property as shown on the 19715-76 tax bill under "full cash value" or, thereafter, the appraised value of real property when purchased [or] newly constructed., or [when] a change in ownership has occurred after the 1975 assessment.' (Id., § 2, subd. (a).)" (Pacific Southwest Realty Co. v. County of Los Angeles (1991) 1 Cal.4th 155, 160, 2 Cal. Rptr.2d 536, 820 P.2d 1046, italics added (Pacific Southwest).)[3]
Because Proposition 13 "did not explicate the meaning of `change in ownership' [citations], it fell to the Legislature to define the phrase.... The main effort to create consistent and uniform guidelines to implement Proposition 13's undefined `change in ownership' provision was undertaken by a 35-member panel that included legislative and board staff, county assessors ..., trade associations, and lawyers in the public and private sectors. The panel's work culminated in the Report of the Task Force on Property Tax Administration (hereafter task force report), which was submitted to the Assembly Committee on Revenue and Taxation on January 22, 1979." (Pacific Southwest, supra, 1 Cal.4th at pp. 160-161, 2 Cal.Rptr.2d 536, 820 P.2d 1046.)
The "task force recommendations resulted in the enactment of the Revenue and Taxation Code provisions now before us [i.e., Rev. & Tax.Code, §§ 60-62]. The Legislature adopted some of the recommendations verbatim or with nonsubstantive technical revisions, and others with rather minor changes. The report's key change-in-ownership test was adopted verbatim and is now codified as section 60...." (Pacific Southwest, supra, 1 Cal.4th at p. 161, 2 Cal.Rptr.2d 536, 820 P.2d 1046.)
Section 60's "governing test" (Pacific Southwest, supra, 1 Cal.4th at p. 162, 2 Cal.Rptr.2d 536, 820 P.2d 1046) contains three elements: "A `change in ownership' means [1] a transfer of a present interest in real property, [2] including the beneficial use thereof, [3] the value of which is substantially equal to the value of the fee interest." (§ 60, italics added.) The Legislature "intended for section 60 to contain the overarching definition of a `change in ownership' for reassessment purposes." (Pacific Southwest, supra, at p. 162, 2 Cal.Rptr.2d 536, 820 P.2d 1046.)
*465 Thus, section 60 sets forth the general rule as to what constitutes a "`change in ownership.'" (Pacific Southwest, supra, 1 Cal.4th at p. 161, 2 Cal.Rptr.2d 536, 820 P.2d 1046.) Section 61 contains various statutory examples of transfers which are included within a change of ownership, while section 62 enumerates transfers which are excluded from a change of ownership. (§§ 61, 62; Pacific Southwest, supra, at p. 161, 2 Cal.Rptr.2d 536, 820 P.2d 1046.)
With respect to life estates, section 61 states in pertinent part that a change in ownership includes "[a]ny vesting of the right to possession or enjoyment of a remainder or reversionary interest that occurs upon the termination of a life estate...." (§ 61, subd. (g), italics added.) Also, section 62 provides a change in ownership does not include "[a]ny transfer by an instrument whose terms reserve to the transferor an estate for years or an estate for life. However, the termination of such an estate for years or estate for life shall constitute a change in ownership...." (§ 62, subd. (e), italics added.)
Thus, the statutory scheme does not expressly address the fact situation presented in the instant case, namely, whether Steinhart's acquisition of a life estate in real property upon the death of her sister Constituted a change of ownership. However, the Supreme Court's analysis in Pacific Southwest with respect to the third prong of section 60 readily resolves the issue before this court.

4. Pacific Southwest's discussion of the third prong of section 60, requiring the value of the interest transferred be substantially equal to the value of the fee interest, is dispositive.

In Pacific Southwest, the plaintiff sold an office building complex in fee simple to a purchaser, Metropolitan Life, for
$310 million. The seller simultaneously acquired from the buyer a leasehold interest in one building for 60 years, including 10 consecutive renewal options of 5 years each, and a leasehold interest in the other building for 21 months, including a renewal option. The leaseback applied to 73 percent of the property. The county assessor ultimately concluded the sale and leaseback had resulted in a change of ownership of the whole parcel and raised the valuation to $323 million. Plaintiff paid tax bills pursuant to the increased valuation and then sued for a refund. (Pacific Southwest, supra, 1 Cal.4th at pp. 159-160, 2 Cal.Rptr.2d 536, 820 P.2d 1046.) Plaintiff contended there had been no change in ownership within the meaning of Proposition 13 because the transaction failed to satisfy any of the three parts of section 60's test. (Pacific Southwest, supra, at p. 162, 2 Cal.Rptr.2d 536, 820 P.2d 1046.)
Pacific Southwest held the first prong of section 60 was satisfied because a transfer of a present interest in real property had occurred. "The entire fee was transferred to Metropolitan Life; the simultaneous creation of a different interest in plaintiff will not defeat the first prong of section 60." (Pacific Southwest, supra, 1 Cal.4th at p. 163, 2 Cal.Rptr.2d 536, 820 P.2d 1046.)
Pacific Southwest further held the transaction met the second prong of section 60, requiring a transfer of the beneficial interest in the real property. "[W]hen Metropolitan Life purchased the property in fee simple absolute it acquired its beneficial use during the lease term. [¶] Metropolitan Life's decision to exercise its beneficial interest by exacting rent from plaintiff rather than acquiring physical control of the demised premises does not alter the character of the transaction." (Pacific Southwest, supra, 1 Cal.4th at p. 164, 2 Cal.Rptr.2d 536, 820 P.2d 1046.)
*466 Most importantly for our purposes, Pacific Southwest held the third prong of section 60 was satisfied because the value of the interest transferred was substantially equal to the value of the fee interest. (Pacific Southwest, supra, 1 Cal.4th at p. 164, 2 Cal.Rptr.2d 536, 820 P.2d 1046.)
Pacific Southwest explained: "Because Metropolitan Life acquired the entire fee, not only did the value of the interest transferred `substantially equal ... the value of the fee interest,' it was of identical value because it was a transfer of the fee itself. [Citation.] The property sold essentially for the market price, and plaintiff is now paying rent at the market rate. There is no indication that the property would resell for less than the market price. Hence, notwithstanding the reservation of an encumbrance in the form of an estate for years, the value of the transfer equaled that of a conveyance of fee simple." (Pacific Southwest, supra, 1 Cal.4th at p. 164, 2 Cal.Rptr.2d 536, 820 P.2d 1046.)
Pacific Southwest reasoned: "In enacting the third prong of section 60 the Legislature meant to insulate from Proposition 13's effect transfers in which only an estate of lesser value was conveyed. Two examples illustrate the Legislature's intent when it adopted the task force report's findings and enacted the statutory scheme before us. [¶] One example considers the conveyance of a lease for one year. It would not be rational to apply a constitutional provision for reassessment following a `change in ownership' when the owner of an apartment leases it to another for one year, thereby conveying an estate of lesser value than that retained. [¶] By contrast, the Legislature decided, following the task force's recommendation, that the creation of a 35-year lease would achieve a change in ownership (§ 61, subd. (c)(1)) because the length of the lease would give the lessee's interest some of the practical attributes of a conveyance of fee simple. A lease of such duration will constitute the main economic value of the land, even though the leaseholder does not own a freehold estatelenders are, in the report drafters' view, willing to lend on the security of such an instrument. (See task force rep., supra, at pp. 39-41.)" (Pacific Southwest, supra, 1 Cal.4th at p. 165, 2 Cal.Rptr.2d 536, 820 P.2d 1046.)
Pacific Southwest then gave another illustration of a transfer in which only an estate of lesser value is conveyed. It stated: "Another example is the conveyance of fee simple from parent to child subject to the reservation of a life estate. The Legislature desired to avoid creating a rule that would characterize such a conveyance as a change in ownership. Because this is a relatively common form of conveyance, the Legislature, again following the task force's recommendation, included it in its list of examples of exempt transfers. (§ 62, subd. (e).) But even if the Legislature had not done so, reassessment would be barred under the carefully drafted basic test of section 60, not only because the beneficial use would not have transferred, but also because the value of each divided interest in the estate would not approach that of a fee. A purchaser of the reserved estate would be buying a life estate per autre viea freehold estate, to be sure, but an estate of questionable value because subject to complete defeasance at an unknown time. Rare is the mortgagee willing to lend on the security of an estate so ephemeral. The value of the reversionary or remainder interest would also be reduced because the time of vesting would be uncertain and, depending on the care with which the original conveyance was drafted, the value of the ultimate estate might be less at the time of vesting because of intervening conveyances, creditors' demands, and the like. [¶] By contrast, when the life estate ends and the remainder or reversion *467 indefeasibly vests in the grantees the value of the estate is known and is identical to the value of the fee. It is at that point that a change in ownership has occurred, as the Legislature specifically provided in accord with the task force's recommendation. (§ 61, [former] subd. (f) [see now subd. (g) ].)" (Pacific Southwest, supra, 1 Cal.4th at pp. 165-166, 2 Cal. Rptr.2d 536, 820 P.2d 1046, italics added, fn. omitted.)
Thus, in Pacific Southwest, the Supreme Court recognized the obviousa life estate is an estate of questionable value because subject to complete defeasance at an unknown time. (Pacific Southwest, supra, 1 Cal.4th at p. 165, 2 Cal.Rptr.2d 536, 820 P.2d 1046.) Therefore, by definition, the value of a life estate is not "substantially equal to the value of the fee interest" for purposes of a statutory change in ownership. (§ 60.)
We are aware Leckie v. County of Orange (1998) 65 Cal.App.4th 334, 76 Cal. Rptr.2d 426 (Leckie), dismissed Pacific Southwest's discussion of the value of a life estate "as dicta." (Leckie, supra, at p. 340, 76 Cal.Rptr.2d 426.) However, even if properly characterized as dictum, statements of our Supreme Court should be considered "persuasive" (Hubbard v. Superior Court (1997) 66 Cal.App.4th 1163, 1169, 78 Cal.Rptr.2d 819) and "its dicta command our serious respect. [Citations.]" (Dyer v. Superior Court (1997) 56 Cal.App.4th 61, 66, 65 Cal.Rptr.2d 85.) When, as here, "the Supreme Court has conducted a thorough analysis of the issues and such analysis reflects compelling logic, its dictum should be followed. [Citation.]" (Hubbard, supra, at p. 1169, 78 Cal.Rptr.2d 819.)
Guided by Pacific Southwest, we conclude the conveyance of a life estate to Steinhart was not a transfer "substantially equal to the value of the fee interest." (§ 60.) Therefore, there was no change in ownership for purposes of Proposition 13.

a. Property Tax Rule 462.060(a) is inconsistent with section 60's substantial equivalency test.

Under the authority of Government Code section 15606, subdivision (c), the State Board of Equalization promulgated Property Tax Rule 462.060(a). Said rule provides: "The creation of a life estate in real property is a change in ownership at the time of transfer unless the instrument creating the life estate reserves such estate in the transferor or the transferor's spouse. However, the subsequent transfer of such a life estate by the transferor or the transferor's spouse to a third party is a change in ownership." (Cal.Code Regs., tit. § 18, 462.060, subd. (a).) This rule was among those adopted contemporaneously with the adoption of section 60 et seq., in August 1979. (Stats. 1979, ch. 242, § 4, p. 506; Leckie, supra, 65 Cal.App.4th at p. 339, 76 Cal.Rptr.2d 426.)
We are mindful that a contemporary administrative construction of a statute by the agency charged with its enforcement and interpretation is entitled to great weight unless it is clearly erroneous or unauthorized. (International Business Machines v. State Bd. of Equalization (1980) 26 Cal.3d 923, 930-931, 163 Cal. Rptr. 782, 609 P.2d 1.)
However, "an administrative rule that exceeds the Legislature's grant of authority as expressed in section 60 et seq. is without effect and may not be enforced. [Citations.]" (Pacific Southwest, supra, 1 Cal.4th at p. 171, 2 Cal.Rptr.2d 536, 820 P.2d 1046.)
Property Tax Rule 462.060(a) deems the "creation of a life estate in real property is a change in ownership at the time of transfer *468 unless the instrument creating the life estate reserves such estate in the transferor or the transferor's spouse." However, as explained, the value of a life estate is not "substantially equal to the value of the fee interest." (§ 60; Pacific Southwest, supra, 1 Cal.4th at pp. 165-166, 2 Cal. Rptr.2d 536, 820 P.2d 1046.) Therefore, Property Tax Rule 462.060(a) conflicts with section 60 and may not be enforced.

b. The Leckie decision likewise is inconsistent with section 60.

In Leckie, the issue presented was whether the creation of a life estate in 58year-old Rachel Cordova pursuant to the terms of a revocable trust, following the death of her cohabitant, Charles Adams, constituted a change in ownership for purposes of reassessment of property value. (Leckie, supra, 65 Cal.App.4th at p. 336, 76 Cal.Rptr.2d 426.) The trial court therein found Cordova's life estate was not substantially equal to the fee interest and ruled no change of ownership had occurred. (Id. at p. 338, 76 Cal.Rptr.2d 426.)
Leckie reversed, holding "a life estate transferred to a nonspouse third party should constitute a change of ownership." (Leckie, supra, 65 Cal.App.4th at p. 339, 76 Cal.Rptr.2d 426.) Leckie relied primarily on Property Tax Rule 462.060(a), which treats the creation of a life estate in real property as a change in ownership at the time of transfer "unless the instrument creating the life estate reserves such estate in the transferor or the transferor's spouse." (Cal.Code.Regs., tit.18, § 462.060(a).) Leckie dismissed the Supreme Court's statements in Pacific Southwest concerning the valuation of a life estate "as dicta." (Leckie, supra, 65 Cal.App.4th at p. 340, 76 Cal.Rptr.2d 426.)
In view of our conclusions that Property Tax Rule 462.060(a) contravenes section 60 and that Pacific Southwest is highly persuasive authority with respect to the valuation of a life estate, we respectfully decline to follow Leckie.

c. The County's reliance on section 61, subdivision (h), is unavailing; irrespective of the fact Steinhart's life estate interest vested when Helfrick's trust became irrevocable, section 60's "overarching definition" of a change in ownership is not satisfied.

Section 61, which sets forth various statutory examples of a change in ownership for purposes of section 60, provides in relevant part at subdivision (h): "Any interests in real property that vest in persons other than the trustor ... when a revocable trust becomes irrevocable." (Italics added.)
In the instant case, Helfrick's trust was revocable and became irrevocable upon the death of Helfrick, the trustor. It was at that point that Steinhart's life estate interest vested. Therefore, according to the County, the transfer to Steinhart of a life estate constituted a change in ownership pursuant to section 61, subdivision (h). The argument is unpersuasive.
As explained, the Legislature "intended for section 60 to contain the overarching definition of a `change in ownership' for reassessment purposes." (Pacific Southwest, supra, 1 Cal.4th at p. 162, 2 Cal. Rptr.2d 536, 820 P.2d 1046, italics added.) Thus, section 60 sets forth the general rule as to what constitutes a "`change in ownership.'" (Id. at p. 161, 2 Cal.Rptr.2d 536, 820 P.2d 1046.) Section 61 contains various statutory examples of transfers which are included within a change of ownership, while section 62 enumerates transfers which are excluded from a change of ownership. (§§ 61, 62; Pacific Southwest, supra, at p. 161, 2 Cal.Rptr.2d 536, 820 P.2d 1046.)
*469 Irrespective of the fact that Steinhart's life estate vested at the time Helfrick's trust became irrevocable (§ 61, subd. (h)), that circumstance must yield to the overarching definition of section 60. Because the transfer to Steinhart of a life estate was not substantially equal to the value of the fee interest, there was no change in ownership within the meaning of section 60.

d. It is not the role of this court to craft a valuation formula based on the life expectancy of the life tenant.

Certain amici have proposed that a life estate should constitute a change in ownership only when its expected duration amounts to the equivalent of a fee estate. Their theory focuses on the life expectancy of the life tenant. They propose to treat life estates in a manner similar to an estate for years. (See § 61, subd. (c) [creation of leasehold interest in taxable real property for a term of 35 years or more constitutes a change in ownership].) Their approach calls for an assessor to consult an actuarial table to determine the life expectancy of the life tenant, and where the probable duration of the life tenancy falls short of 35 years, the value of the estate would not be substantially equivalent to a fee interest and would not trigger a reassessment.
There are numerous flaws in this argument.
First of all, the 35-year benchmark for leasehold estates is established by legislative fiat. (§ 61, subd. (c).) It is not the role of this court to import that rule into the valuation of life estates.
Further, even assuming it were appropriate to consider the life tenant's life expectancy, that would be no simple matter. What actuarial table would be used? If a life estate is conveyed in joint tenancy, will two actuarial tables be utilized? Also, life expectancy varies based on gender, race or ethnicity, tobacco use, income, occupation, and place of residence, among other factors. Does the life tenant's health matter? What if the transferee has a chronic or life-threatening illness at the time of the transfer?
Moreover, unlike a leasehold interest of 35 or more years, a life estate, irrespective of the life expectancy of the life tenant, is an "estate of questionable value because subject to complete defeasance at an unknown time. Rare is the mortgagee willing to lend on the security of an estate so ephemeral." (Pacific Southwest, supra, 1 Cal.4th at p. 165, 2 Cal.Rptr.2d 536, 820 P.2d 1046.)
For all these reasons, we reject the proposal of certain amici that only life estates with an expected duration of 35 years or more should be deemed "substantially equal to the value of the fee interest." (§ 60.)
Instead, we agree with Steinhart that the transfer of a life estate in real property never constitutes a change in ownership. Rather, "when the life estate ends and the remainder or reversion indefeasibly vests in the grantees the value of the estate is known and is identical to the value of the fee. It is at that point that a change in ownership has occurred, as the Legislature specifically provided in accord with the task force's recommendation. (§ 61, [former] subd. (f) [see now subd. (g)].)" (Pacific Southwest, supra, 1 Cal.4th at p. 166, 2 Cal.Rptr.2d 536, 820 P.2d 1046, italics added.)

DISPOSITION
The judgment of dismissal is reversed with directions to reinstate Steinhart's *470 complaint. Steinhart shall recover costs on appeal.
We concur: CROSKEY and ALDRICH, JJ.
NOTES
[1] All further statutory references are to the Revenue and Taxation Code, unless otherwise indicated.
[2] Section 60 states: "A `change in ownership' means a transfer of a present interest in real property, including the beneficial use thereof, the value of which is substantially equal to the value of the fee interest." (Italics added.)
[3] Proposition 13 permits an adjustment for inflation, not to exceed 2 percent per annum. (Cal. Const., art. XIII A, § 2, subd. (b); Pacific Southwest, supra, 1 Cal.4th at p. 160, 2 Cal.Rptr.2d 536, 820 P.2d 1046.)